I'd like to start off by making a correction. It's somewhat of an inauspicious way of starting off. I relied on United States v. Finley. It's a Ninth Circuit case. I erroneously cited it as 310, F3, page 1000. It should be 301, F3, 1000. Nevertheless, it does support our psychological testimony is particularly relevant in this case, and especially on the issue to battered woman syndrome, which the Ninth Circuit has recognized as a viable issue in cases like this since 1992. The problem is your report isn't too good. The expert's report doesn't really say that she had, she suffered from this. And also, all it goes to is presence. The government had quite a bit more evidence there than presence. I mean, there were notes with her handwriting on it. These letters were all, the identity things were all over the place. Some of the letters she was writing, there's evidence from the Kmart, I forget, there was some shopping that she was done, I forget what the store was, but some such store. You've got a lot there, none of which goes to, none of which the expert's report really went to refuting. Well, if the court recalls, I mean, the basis of defense was that she was concerned about all these gifts that were coming home, and she thought he was having an affair with another person. So she was jotting down all this personal information. Well, that was her explanation, but Julie didn't have to believe that. And some of the notes had his handwriting on it, too. So how do you explain that? It was her handwriting and then his handwriting. So, you know, I... Well, I agree. I mean, there are issues that are problematic. But still, I don't think simply because there are credibility issues that went against her, that is a reason for the judge entirely excluding any evidence of the battered woman syndrome. Well, I think we've gone a little bit off track. You're right. The question becomes, what would the expert's testimony have? How would it have helped her? First of all, as best I can tell, there was no diagnosis that she suffers from this, the expert's report. You know, you didn't file a... The government raises it. I didn't see a gray brief. I don't know if you filed a gray brief, but I didn't see one. But the government makes a pretty good point that, look, look at what the expert said. There was going to be a whole discussion about battered women syndrome and all that, but no matter what you say, you know, this person, Ms. Andrews, suffers from this. And I don't know how that all helps you. Your Honor, I agree. The doctor's diagnosis did not come to the, quote, conclusion that she suffered from battered woman syndrome, but I don't think that this is... We can't just let the expert get on the stand and give us an exegesis in the theory of battered child syndrome. I mean... Well, what issue is it relevant to? What issue at the trial is it relevant to? Well, it shows why she would stay in this small one-bedroom apartment as a teenage mother of an infant son and not get up and leave when all this evidence of unlawful activity was seeping into the apartment. It gives the jury somewhat of a credible explanation why she would stay in such an environment. Because there was no... Duress was not proper as a defense. That's correct. And we still concede that. Duress was not a defense. We just think that in order to get an accurate and fair and balanced picture of what was going on in that young single parent's life, a expert psychologist who examined her and spent a great deal of time would have been a great benefit to the trier of fact the jury in this case. If the government had tried to draw an inference of complicity from presence alone, I think you'd have a pretty good case. But the government had piles and piles of other things. It wasn't just she was... I mean, she could have been present in the house, and if they had said, look, there's all this stuff around, she was present, she must be an accomplice, then I think you would have had a pretty good case for saying, well, here's the reason why she stuck around. But they had all this other evidence. They had all this other evidence that she was actually involved. All right. I think that goes to the second step of analysis. I would argue the court erred. It's de novo review. And then assuming arguendo, you find that the court did err in precluding any and all evidence of battered woman syndrome. Then you get to the second step. Was it harmless? Did it make a difference? Then you are in a position to weigh and balance the strength of the government's case, which I don't think was that strong. Well, it actually sort of follows up on Judge Sand's question. Since the government did not... there was no duress, it was not an issue. Correct. Okay. So you take that logical inference out of the case. If she said, look, I did it, but it was a duress, then this would help her. So then you have to ask, how does the battered woman syndrome thing help her at all? And one way of doing it is to say, well, since they used mere presence as the inference for her being an accomplice, this explains away her mere presence. But presence wasn't really what the government's case was about. They did have some additional factors. I can see that. Did they rely on presence at all? Beg your pardon? Did they rely on presence at all? I didn't see where they argued presence. They said, look, she was in the house. I don't see where that was part of the case at all. They tried very hard, I thought, to bring in actual evidence that she was actually and personally involved. They did, and there is evidence of that. But I think in final argument, if you look at the final argument, I mean, presence was one of the factors that the government relied on in their closing argument. And then they kind of belittled the battered woman. Well, we weren't able to flesh out the battered woman issues, but the government argued that this issue about my boyfriend is a bully, is a red herring, a smokescreen, a distraction, just full of stories and fantasies. So the government, as a result of its success in convincing the Superior Visitor Court judge to exclude all that, was able to capitalize on that and argue that this evidence about a woman's syndrome, my boyfriend is a bully, type of defense. But the jury would still have to believe, even if you let the evidence in, that the predicates for it exist, that the guy really is a bully, that the boyfriend really was a bully. And South Carolina government was saying, look, don't believe her, that the guy is a bully. There's no evidence. She's just saying that. Well, that's what the government said in closing argument, but I think there was ample evidence sprinkled throughout the record of trial indicating he was a bully. It was a very violent behavior. Family members, the mother saw black and bruises, black marks and bruises all over her body in certain points in time. Even one of the prosecution witnesses said it was a violent, abusive behavior. I mean, it went both ways, but our position down below was Jeffrey Clody, the husband, excuse me, the live-in boyfriend, was the primary motivating factor in this violent, domineering relationship. What was her explanation for her active participation, the evidence showing her active participation in the crimes? Well, most of the ones are notes. Those were taken because she had this idea in her mind that her boyfriend was writing his notes down because he was having an affair. Some of them relate to a man. Some of them relate to men. Why was she taking notes about men, involved about men, if she was worried about her husband having an affair with a woman? Well, as she testified on the stand, it was more of a rote response. She was doing this when her boyfriend would leave. She was writing this down as fast as she could possibly, hoping not to get caught and incur harassment. So she wasn't paying particular attention. So she was writing down stuff about males? Well, that was her... Who's Michael Broad? Was that somebody that she was afraid he was having an affair with? No. She had no idea who these people were. Why was she writing up profiles of Michael Broad? Because maybe he would be in a position, if she was able to have the opportunity to call him, to find out what's going on. Where are all these charges being written to? She thought Michael Broad was a real person? That's her testimony. She had a counterfeit license for Broad with Broad's personal identification and Cody's picture on it. But that was her... The notes that she was making was not on any type of identification with Cody's picture on. So there was nothing to connect her up with Cody's picture. These were notes. These are credit card receipts. She was just taking down raw information data pretty much on a, you know, in a surreptitious setting, doing her best trying to figure out who these people were. She didn't care whether they were male or female. Was she trying to get some black man information on him? So she could turn him in for these activities? Is that her explanation? No. She was writing... What was the point of writing all this down? She was trying to do, quote, detective work, or try to figure out who these people were that all these expenses were being written off on. I mean, she had no idea who these people were. Why? I mean, we have a perfectly good reason offered by the government why she would do this. If you've got these false identities, you don't want to tap them out because you get suspicious. So you try to be careful in how much you use, and so you have to sort of keep track of which credit card or which identity you are using. That's the government explanation. And she's the one who's keeping track of what's going on. Her explanation is, no, no, no, I didn't do this for that reason. I did it for this other reason. And I guess I thought what she was saying is that I was keeping track of what I was doing. I was keeping track of this activity so I could threaten to turn him in if he really went to, or I could turn him in to the police if it turned out he was cheating on me. But you're saying that's not her explanation. So what was her explanation? What was her legitimate reason for keeping these notes? Her legitimate reason was trying to use them as a starting place so she can track down or get some witnesses to figure out or at least tell her where all these items that were being purchased were going to because she was not getting any of it. Remember, she has an infant, a small child, and they were still living in poverty. They couldn't make their bills. So she knew that her boyfriend was out there doing something with all this money that evidently he was acquiring that was verified by these receipts. And so she was tracking, her primary motivation was she thought he was having an affair. She was writing down all these notes. She didn't have much time to do that in the hopes that she could She was going to do a skip trace on it? You know what? I don't know what went on. It's all for the jury, right? That's true. It's all for the jury. It doesn't really have any bearing on whether or not the court should have precluded an entire area of expert psychological testimony. I think it would have benefited. And sure, we can come up with all these reasonable interpretations. And I'm conceding the government had a lot of good circumstantial evidence. How do you deal with, I mean, back to the question I asked you in the beginning, the expert never says, I mean, even if we can sort of make this connection, never says she's suffering from this bad woman syndrome. There's a sort of exegesis of the theory of this, but unless you can tie it in to your client, where's the relevance? Well, I don't think anybody has to, I mean, a bad woman syndrome is a number of little facts. I mean, it's not a, like a DSM-IV type situation where if certain things are exhibited, you can automatically conclude that you fit within the parameters. You said bringing in a fingerprint expert. Let's say you find a fingerprint at the scene of the crime, and you bring a fingerprint expert with a chart and gives you a big theory about the fingerprint, but then at the end doesn't say, and this fingerprint was the same as the victim, or the same as the defendant. What's the point of the whole expert testimony unless at the end he says, and based on these factors and based on my expertise, I conclude that this person, this defendant was suffering from this. In the fingerprint scenario, if there's points of identification or points of similarity, the more points, the stronger the expert's opinion will be, the latent and the known are made by the same person. The fewer points of identification, he's less inclined to render a strong opinion. Fifteen or more points, he can say conclusively, that was made by the same person. You translate that into the bad woman syndrome. Sure, the doctor in this case was not able to say she fits all 15 points that are classic symptoms of the bad woman syndrome. What does he say? How does he tie it into her? What is the strongest statement he can make about her? There are symptoms that she found and observed on Ms. Andrews that are consistent with the bad woman syndrome. Now, she didn't get to the objective points, the number of points that she was allowed by the district court to say yes. Isn't this exactly the kind of decision that we leave to district judges to make? It might be a little different if there had been a strong opinion, but this sounds to me like the kind of thing that is fairly weak and highly tentative, capable of misleading the jury, and we have a district judge sitting there watching the trial and makes a wishy-washiness of the testimony and how little is tied into any theory of defense. We do review for abuse of discretion. That's true, I agree. It's hard to say there was abuse. Well, I throw in the word substantially. I mean, the probative value has to be substantially, and I can't overemphasize the word substantially, outweighed by this perfectly capable government attorney down below who can flesh out any confusing issues if Dr. Martha Rogers was permitted to testify. So I think in this balancing process that the judge must engage in, in order to conclude that the probative value of this battered woman syndrome evidence was substantially outweighed by the tendency to confuse the issues, I think was mishandled, because I don't think, and I agree, the battered woman syndrome evidence could have been stronger. There's no question about it. Don't do about three and a half minutes. Do you have any other points you wish to raise? Well, I think the sentencing issue, are you talking about on this issue or the sentencing issue, because I think Ammaline pretty much takes care of my sentencing issue that I raised, and I'm prepared to submit it. So you're asking us to remand for resentencing? Yes, I think Ammaline certainly supports my position on that. I'm talking about the re-hearing, not the 376 after, but the most recent re-hearing was granted. And you're confident that you won't do worse, your client won't do worse under an Ammaline remand? I don't know, I don't even know who, I didn't notice who the district judge was or anything else. Dennis Totler, yeah. No, I don't think she'd do any worse. I'm sorry? I don't, I was answering Justice Trott's question, I don't think she would do any worse on remand. Are you asking for remand? Yes, I did in my opening brief. Why are you reluctant to ask for a remand? Well, I mean the nature of questioning makes me try to think this through, maybe I'm not doing the best thing for my client. If you say yes, you're toast. I know, that's what I'm concerned about now. But the lawyers are worried about that. The reason is, if you, you know, you have a sentence now and I don't, I mean, whatever the sentence is, if we send it back, this gives the district court another shot at sentencing, it gives the government a chance to argue under the new standard, and again, I have no idea I mean, Justice Totler is an excellent judge and I'm sure she would do a very reasonable job whatever, but it does open up the whole field and you're not just back there for downward departure time this is now, you're now looking at consecutive sentences and words you haven't heard in 20 years that then become an open possibility, so this is not a we're not taunting you, this is a genuine question Do you really want an Emily remand? It is a it opens the whole field up and may or may not go down to your client's interest My only concern would be you know, some sort of punitive action taken and I'm confident, knowing Judge Totler and the U.S. Attorney, that would not happen I don't think in Judge Totler's case he's not going to go over like that nothing of the sort, but again I don't know what else is in the case and what else the government might argue on remand and at least open the theoretical possibility I'm not trying to talk you out of anything, believe me but we have given some thought to what happens and one risk the defendant takes the generic defendant in the generic case, is that when you go back the district judge now with newfound powers and the government now with newfound authority to argue for upward departure, or what is no longer an upward departure what is now a reasonable sentence outside the guidelines range may take it in the head in this particular case to pursue a more harsh punishment and maybe the district judge exercising her discretion in light of the new circumstances I'm not speaking about your case or Judge Totler in particular I would not worry about retaliation, I don't think that is an issue but you know your case better than we do Do you want to think about it? I'm confident it wouldn't get any worse but I'm just wondering how much better it could get given the sentencing that occurred and all I'm going to do You have 7 days to send us a letter You are not asking for an Evelyn Riemann I can't tell you what we're going to do about it, Evelyn is not your final so it may not be up to you anyway but at least we'd like to hear what your views are Fine, thank you, I appreciate that Thank you Does the government have a view on Evelyn Riemann? Yes your honor The government has taken the position, I mean honestly this is not the correct form to raise it I would think but that Evelyn too is wrongly decided that it focuses on the wrong error I'm sorry, I was not asking for your view on Evelyn, I understand the government has a weak view I was really asking a different question Assuming there is a Riemann in a particular case Riemann's might be possible in any one case now in appeal and obviously the defendant has some interest in a Riemann for a possible downward departure but of course departures go both ways and now they become much easier both downward and upward we can't even quite call them departures anymore so I was really just asking the question whether the government either in this case or in general is taking the position that it wants to go back and try to get a sense of enhancement given the district judge's newfound powers I apologize I didn't understand the question our position in this case is that we would not want a Riemann and our position generally is that we do not want Riemann's to go back and ask for higher or different sentences we think usually that the guideline sentence that was given fairly reflects the considerations highly commendable, I just wanted to know what the government and I think it's particularly true in a case like this where the district court didn't impose the lowest sentence possible I mean the district court had the option of giving a 15 month sentence which was the bottom of the range and gave a 16, I mean it's one off but the court knew it could give less and didn't do so, so I mean I think that to the government's view that that suggests that there's no problem under plain error view and we don't want a Riemann on the sentencing issue May it please the court, Eric Silver on behalf of the United States turning back to the expert testimony, I would like to make clear what the proffer was that this evidence would show because it wasn't focused on the entire case explaining mere presence it was focused on explaining her presence in the apartment on May 24th, the date of the search warrant when the mail was present this is 10 days after the offenses alleged in the indictment were completed at that point, and the defense at trial as to the allegations that were in the indictment which occurred on May 8th and May 14th was not mere presence, in fact it was the exact opposite of that, it was that Cloudy had disappeared from May 6th to May 13th, he had returned briefly on May 13th and then gone out again returning the night of May 14th so that he was not around at the time that these transactions were made and she was not involved in any way in the offense so I think it's important with the expert testimony to kind of evaluate what this was being used to explain and how it was relevant to the charges in the indictment. Now defendant at the time of the proffer disclaimed that this was going to be admissible to establish intent that was the choice the defendant made and it appeared to be done so that there would not have to be disclosure under Rule 12.2 but having disclaimed intent, it arguably would have been admissible for that purpose and the court actually said... By intent you mean duress? Well no, I would say to rebut the idea that when she did an act Actually, rebut intent by showing duress or by showing this syndrome as negating intent. Exactly. That was what was going on in Dunn in the Tenth Circuit case where you had an alien abetting charge and a mere presence defense and the defendant in that case wanted to introduce the battered woman syndrome to rebut the evidence of specific intent. Now that was a stronger case for admitting that because her presence is as the crime was going on I mean she was there while they were kidnapping and shooting people and the government's evidence regarding her guilt really focused on mere presence where that's not the case here. I mean the government's theory in this case was that she was an active participant in this fraud and was not dependent on the mere presence defense and the jury was presented with that view I mean the jury was presented with the Exhibit 17 which are the profile notes that contains Broad's information as well as other profile notes that she wrote. The government's theory which was supported by the testimony of Inspector Malgrom. These are profile notes. I mean it was apparent from looking at them that they were profile notes. If the panel has no further questions the government would submit. Thank you very much. Thank you. Even though the case was submitted to let us know what your position was as to the remand. We'll take a short recess before arguing the next case. Thank you. This court shall stand in recess. Thank you.
judges: Kozinski, Trott, Sand